### BROFFE v. HORTON.

No. 118, Docket 21161.

United States Court of Appeals
Second Circuit.

Feb. 3, 1949.

Petition for Amendment Denied
March 23, 1949.

See 173 F.2d 565.

Walsh and Levine, of New York City (William F. Walsh and James Harte Levenson, both of New York City, of counsel), for plaintiff-respondent.

Satterlee, Warfield & Stephens, of New York City (James F. Dwyer and Bennett Frankel, both of New York City, of counsel), for defendant-appellant.

Before L. HAND, Chief Judge, and CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from a judgment for the plaintiff in a suit to recover damages resulting from the defendant's alleged fraudulent representations and concealments in the sale by the plaintiff of two hundred and four shares of the common stock of Miller Marine Decking, Inc., and of its notes of the face value of $5,000. Diversity jurisdiction is clear and unquestioned.

The above mentioned corporation, which will be called Miller Marine, was organized under the laws of New York and at all material times had its principal office in New York City. Its business, which was

491

the installation of composition deck covering on ships, was largely war born and dependent upon the extent of the government's ship-building activities, but it enjoyed a prosperous business under government contracts during the late war. In 1942, however, it was in poor financial condition though its prospects in view of the war were good.

Early in that year Broffe, the plaintiff, having become acquainted with the situation of Miller Marine called it to the attention of the appellant, Horton, with whom he had been on friendly terms for some years. Both being experienced business men, they considered the question of obtaining control of the corporation and worked out a way to do that upon an investment of $20,000. The corporation had 1200 shares of common stock outstanding all of which were owned by a man named Dale and by Miller, who had developed the formula for the composition decking covering, and by Miller's son. Broffe put in $5000, Horton $5000, and a Baron Von Zuylen $10,000. In part with the $20,000 thus raised the interest of Dale was purchased and he dropped out. Each of the men who advanced the money to make up the $20,000 received five per cent notes of the corporation for the amount of money they put in, Broffe taking two notes, each for $2500, and in addition each got shares of its common stock as a bonus; Broffe and Horton received 204 shares each and Von Zuylen 288 shares. One Waters received 108 shares as a finder's fee and one Andre de St. Phalle received the same number of shares for obtaining the $10,000 from the Baron. The Millers retained 288 shares. In 1943, after the other stockholders had been offered a chance to participate in buying Von Zuylen's shares and had declined, Horton paid him $13.92 a share for them.

Meanwhile the business of Miller Marine was conducted until September 1942 with Broffe in charge as president, but in that month he resigned, was elected vice-president, and went to Cambridge, Md., to manage another corporation in which he was interested. Thereafter he took no very active part in the affairs of Miller Marine but continued to draw a salary as vice-president and was a director of that corporation until July 15, 1944. He knew the corporation was operating under government contracts and doing a good business, but he did not know in detail just what that was and took no pains to find out. When Broffe resigned as president, Horton was elected to that office and continued to hold it until some time in 1946. During that period he was in active charge of the business of Miller Marine.

In April, 1944, Maguire Industries, Inc., made an offer to take over Miller Marine for a total consideration of $60,000. Horton recommended the rejection of the offer and Broffe, to whom the offer was made known, concurred in its rejection. The corporation made a net profit of $12,590 for the year ending June 30, 1943. For the last six months of 1943 its net profit was $32,293. At a meeting of the board of directors on May 17, 1944, which Broffe did not attend, contracts for installations totaling $1,085,709.40 were approved and on June 30, 1944, the corporation had on its books unfinished business aggregating $1,566,165.17, which it completed at the rate of $40,000 to $50,000 a week up to July 19, 1944. Broffe did not receive a copy of the minutes of that meeting but was sent a copy of the corporation's May financial statement. The corporation obtained sizeable contracts during the summer of 1944, which were not entered on its books at once and of which Horton knew but the other directors did not, and it continued to prosper throughout that year, its net income for the six months ending December 31, 1944, being $112,837.

The foregoing, up to late June 1944, will serve as the background for the fraud which the plaintiff-appellee alleged in his complaint. Those allegations are that the appellant dominated the business policies and affairs of Miller Marine and concealed the amount of its assets and earnings, both actual and anticipated, from the appellee; that in July 1944 and before the 20th of that month the appellant falsely and fraudulently represented to the defendant that one Gerhard Dahl wanted to buy the appellee's Miller Marine stock for the sole reason that obtaining a stock interest would enable him to secure a position with Miller Marine on a salary and that he offered the full

value of the stock which the appellee would be well advised to accept; that the appellee believed these representations of the appellant to be true and thereupon sold and delivered his stock to Hayden, Stone & Co., as agents, against the payment of $8,888.93 which was $43.57 a share; that the appellant knew his representations were false and made them intending to deceive and defraud the appellee in breach of the fiduciary relationship existing between the appellee and the appellant as the president, a director, and principal stockholder of Miller Marine; that the appellant fraudulently concealed from the appellee additional business obtained by Miller Marine on "which it was estimated that the Corporation would realize a profit of $700,000.00 or more."

It was also alleged that the appellant fraudulently concealed from the appellee the fact that appellant was before, and at the time, the appellee sold his stock, negotiating for the sale of the stock of Miller Marine at a price greatly in excess of that for which the appellee was induced to sell his stock; that the representation that Dahl was the purchaser of appellee's stock was false and that "in whole or in substantial part" it was in fact purchased by the appellant, or by his wife, or by agents acting in his behalf. And further it was alleged upon information and belief that the appellant continued to negotiate for the sale of Miller Marine stock and that shortly after he had induced the appellee to sell his stock did sell the stock of Miller Marine to the Panhandle Producing & Refining Co., Inc., for $321 per share which was paid to the appellant and others.

The suit was tried by the court on the merits after the appellant had answered the complaint by what amounted to a general denial. The court filed extensive findings which sustained the allegations of fraud only in two respects: (1) That the appellant concealed the true condition of Miller Marine's business from the appellee and (2) that his representation that Dahl was the purchaser of the stock was false. What the court found, on adequate evidence, in respect to the elements of fraud on which he entered the judgment from which this appeal was taken is substantially as follows.

Dahl was a long standing friend of both Broffe and Horton. He was thought to be a man of means and the appellant had at one time been employed by him. Late in June or early in July, 1944, Dahl told Horton that he needed more income and inquired whether he could have a salaried position with Miller Marine. Horton told him he could if he were willing to buy some stock. Dahl expressed his willingness to do that.

Horton knew Broffe had, in February, said he wanted to sell his stock, and while Dahl was present, Horton called Broffe by telephone at Cambridge, Md., and told him Dahl wanted a position on a salary with Miller Marine and would like to buy his stock in order to get one. Broffe said he was interested in selling his stock and his notes and named prices for them. He asked Horton what the stock was worth but Horton declined to state his opinion and referred him to the corporation's financial statement of May 31st. In a second telephone conversation Broffe told Horton he would take $15,000 for his stock and notes. Horton told Dahl of this offer to sell and Dahl then said he would pay $14,000 for them. Horton communicated this offer to Broffe on or before July 12th in a third telephone call and it was accepted, $8,888.93 being the price of the stock and $5,111.07 that of the notes.

On July 12, 1944, Broffe mailed Horton a letter in which he enclosed the notes and the stock certificate endorsed in blank, saying that he "did not fill in Gerry's name as I was not sure exactly how he wanted it transferred." After saying that he would like two checks, one for the notes and one for the stock, and that he understood that the sale would be consummated by July 15th, he added, "Tell Gerry I wish him all the luck and hope that this stock some day will be worth One Million Dollars."

It does not appear just when Horton received this letter but at a meeting of the directors of Miller Marine on July 18th he advised the board that Dahl had arranged for the purchase of Broffe's stock and recommended that Dahl be employed as an executive assistant at a salary of $9,600 a year beginning July 1st. A resolution to this effect was adopted, and Dahl was then

elected a director in place of Mr. Dooley who had been Broffe's man on the board and who resigned.

Sometime before the 18th of July, the exact date not being found, though Dahl testified that it was between the 12th and the 18th and Horton that it was a day or two before July 19th, when the stock certificates into which the Broffe stock certificate had been transferred were ready for delivery to Hayden, Stone & Co., Dahl told Horton that he had intended to pay for the stock out of cash in a Grace V. Krembs account which he managed for Mrs. Krembs under a power of attorney. He said he had decided, however, that the purchase would take a greater part of that account's funds than he wanted to invest in such securities and asked Horton if he would take half the stock. Horton didn't want to do that but said Mrs. Horton, who had funds of her own for investment, might be willing to. She was willing to take half the stock and Horton so informed Dahl. Then on July 19th the certificates, one issued in the name of Hayden, Stone & Co., for 102 shares and one for 99 shares issued in the name of Dahl were sent enclosed in a letter to Hayden, Stone & Co., together with three certificates of one share each which Dahl agreed to have issued to qualify the holders to be directors of Miller Marine, Broffe being named in one of these certificates. The notes were also enclosed and Dahl directed the brokers to receive the notes and the stock certificates for the account of Mrs. Krembs and to send two checks to Broffe each for the amounts above mentioned. This was done. He also in the same letter directed the brokers to deliver the four certificates not in the name of the brokers and one of the notes to Mrs. Horton's brokers against payment of one half the price Broffe was paid. This was done.

There was some delay in the receipt of his checks by Broffe because they were mistakenly sent to him at Cambridge, Mass., instead of Cambridge, Md. and he telephoned Horton about it. Horton did not mention the fact that Dahl had not taken all the stock and notes and Broffe didn't learn of that until after the sale some time

in December 1944 of all the Miller Marine stock and notes to Panhandle Producing and Refining Co., Inc.

That sale was brought about through the efforts of Dahl. It followed an offer made by another prospective purchaser after Broffe had sold his stock. Horton did not know at the time Broffe made his sale that either of these offers were to be made. The one of Panhandle Producing & Refining Co., Inc., was accepted and proved to be an exceedingly advantageous one for Miller Marine security holders who eventually received $291,200 for their holdings. Broffe heard of this and later, after he learned that Mrs. Horton had taken part of the shares he sold, brought this suit.

Although the findings are on the whole extensive and clear, there is, as above indicated, no finding to show when Horton first knew that Dahl was not to purchase the notes and the stock himself. Until then at least Horton was simply acting as the intermediary through whom a third party, Dahl, was negotiating for the purchase of Broffe's stock. While he was acting in that capacity, or in any other for that matter, he made no false representations. He has been held liable solely because he failed to disclose to Broffe (1) pertinent facts he knew and Broffe didn't concerning the financial condition and business prospects of Miller Marine and (2) the purchase by his wife of part of Broffe's securities.

■ The fact of his non-disclosure was not disputed and clearly established, but the legal effect of that depends wholly upon when he knew the facts as to the ultimate disposition and his legal relationship to Broffe up to the time Broffe made the completed sale. At least as early as July 12, 1944, when Broffe mailed his securities to Horton (Miller Marine acted as its own transfer agent) for transfer and delivery to Dahl as the purchaser, the equitable title was in Dahl and Broffe was bound. He had agreed to deliver the securities against payment of the agreed price and he made the delivery as agreed. His letter of transmittal shows that he put the transfer of the stock at the disposal of Dahl not knowing how he wanted that done and of course

he neither needed to nor did say anything about the notes, for they were negotiable. So if Horton did not know until after Broffe had completed his sale that Dahl was not going to take all the securities himself he concealed nothing in that regard which induced Broffe to sell without further inquiry as to value. He was in that case nothing but a gratuitous agent, at most, of the buyer and if he ever became the agent of the seller it was only a likewise gratuitous agency to deliver the securities after the seller was irrevocably committed. Grossman v. Herman, 240 App.Div. 525, 270 N.Y.S. 669; Reese v. Texas Company, 266 App.Div. 550, 42 N.Y.S.2d 545; Railways Corporation v. Ray Consolidated Copper Co., 1 Cir., 25 F.2d 232.

█ Absent the fact that Horton knew before Broffe was committed to the sale of his securities that Mrs. Horton was going to buy part of them, there was no actionable concealment of the financial condition and prospects of Miller Marine. On that assumption Horton knew only that Broffe was selling his securities to a third party. Horton had no financial interest in such a sale. His so-called concealment amounted to no more than that he declined to set any value upon them and told Broffe in effect to make up his own mind. Broffe was not only a director of Miller Marine who had been fully conversant with its affairs and was then in a position to become so again if he cared to make the effort to do so but he was an experienced man in that particular business who knew how to inform himself and to form his own opinion as to values. Horton stood in no fiduciary relationship to Broffe upon a sale by Broffe to Dahl merely because he knew of that sale and, without being asked, he was under no duty of disclosure concerning the condition of Miller Marine. If Broffe, without being induced to do so by false representations as distinguished from nondisclosure by Horton, became bound upon the sale of his stock to Dahl, while Horton understood that Dahl was the purchaser, this suit must fail.

█ On the other hand, if Horton knew while he was negotiating with Broffe for the purchase of the securities that Mrs. Horton was to buy part of them his liability is the same as though he were a secret purchaser. Cf. Helvering v. Clifford, 309 U.S. 331, 335, 60 S.Ct. 554, 84 L.Ed. 788. He would then have been under a duty to disclose to Broffe, who was a director as well as a stockholder, pertinent facts regarding the corporation which he knew would influence Broffe in deciding whether to dispose of his stock at all and in determining its value. If he made the purchase openly from another director we shall assume for present purposes that he would be liable only for actual misrepresentation as to the corporation's condition but if he made the purchase secretly and prevented such inquiry as the seller might make if he knew one well acquainted with the corporation's affairs and prospects wanted to add to his holdings, he was bound to disclose the facts within his knowledge which the seller would naturally want to know and would learn if not diverted from inquiry. He could, in short, deal openly and leave the seller to investigate as he chose or deal secretly and be bound to disclose the facts pertinent on the question of value. George v. Ford, 36 App.D.C. 315; Fisher v. Budlong, 10 R.I. 525. Cf. Carpenter v. Danforth, 52 Barb., N.Y., 581.

█ Of course we do not know whether on the remand the question of damages will be reached. But it may be well to allude to it briefly in the event that it is. The court allowed nothing on the score of the notes. As regards that, the failure to allow damages was clearly right. They apparently were sold at their face value plus accrued interest and that was their full worth.

■ █ In computing the damages on account of the stock the court found as best it could the fair value of the stock at the time of Broffe's sale. It was closely held and there had been no sales which would be some indication of value as of that time. It had no fair market value to be shown. The fact that it was sold in December 1944 for what proved to be a very large net return per share was disregarded and rightly so as there was no proof of anything which, when Broffe sold, would fore-

cast the likelihood of such a disposal of the stock.

What the court did was to find that the total amount of government contracts Miller Marine had accepted, or was about to accept when Broffe sold his securities, was about $3,000,000. This was a fair estimate though the appellant suggests that $2,900,000 would be more nearly correct and perhaps that is so but there is so much of give and take in taking such a computation that we can't say that the round figures of the court are clearly erroneous. He then found that the net profit after taxes on the completion of these contracts was 8% or $240,000. As they were subject to cancellation by the government and to renegotiation he took off 40% for that. It is of course an estimate, for such a factor is incapable of exact computation, but that something should be allowed for such uncertainty is plain and again we cannot say that the amount is clearly erroneous. In this way he arrived at a net value of $144,-000 for the Miller Marine shares, or $70.00 each.

The measure of damages is the difference between the fair value of the shares where Broffe sold them and the price at which he sold. Reno v. Bull, 226 N.Y. 546, 124 N.E. 144; Ross v. Preston, 292 N.Y. 433, 55 N.E.2d 490. And where there is no fair market value their fair value is to be determined from all the pertinent circumstances both for a reasonable time before the sale and after it. Crandall v. A. B. Leach & Co., 221 App.Div. 263, 223 N.Y.S. 127. If there can be no exact calculation, as is the case here, the wrongdoer cannot complain if a reasonable approximation is reached. Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825. His wrong is not to be unredressed merely because the amount is somewhat uncertain. Bigelow v. R. K. O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

It was also right to compute the damages on the basis of 204 shares sold and not merely on the number taken by Mrs. Horton. If there was any actionable concealment it affected each share sold, one as much as another.

Reversed and remanded for further proceedings in accordance with this opinion.