Bernice Frank ROSS and Lawrence H. Frank, Plaintiffs,

v.

Charles S. LICHT, Samuel Bernstein, Michael J. Coviello, Leonard Bluestone, Edward Grapel, William V. Licht, National Hospital Supply Co., Inc., Henry Licht, Seymour M. Friedman and Sidney E. Licht, Defendants.

No. 62 Civ. 1428.

United States District Court
S. D. New York.

Feb. 6, 1967.

Jackson, Nash, Brophy, Barringer & Brooks, New York City, for plaintiffs, Sherman J. Saxl, New York City, of counsel.

Irwin L. Germaise, Millard & Greene, New York City, for defendants, Myron J. Greene, New York City, of counsel.

WYATT, District Judge.

This is an action for damages under the Securities Exchange Act of 1934 (15 U.S.C. § 78a and following; the "1934 Act"). Jurisdiction is conferred on this Court by 15 U.S.C. § 78aa. It is conceded by all parties that there was a use of the mails in connection with the transaction in suit (Pretrial order, p. 2).

There is one cause of action in the complaint based on a sale by plaintiffs to defendants in 1961 of 62½ shares of Class A common stock, par value $100 per share, of National Hospital Supply Co., Inc. (National), a New York Corporation, whose offices were at 38 Park Row in the Borough of Manhattan.

The action was tried to the Court without a jury, no party having demanded a jury (Fed.R.Civ.P. 38(d)).

The 1934 Act (15 U.S.C. § 78j) makes it unlawful to employ in the *purchase* as well as in the sale of any security any "manipulative or deceptive device or contrivance" in contravention of any rule of the Securities and Exchange Commission (the SEC or Commission). The Commission has promulgated Rule 10b–5 (17 C.F.R. § 240.10b–5) which in effect made applicable under the Act the general antifraud provisions of Section 17 (a) of the Securities Act of 1933 (15 U.S.C. § 77q(a); the "1933 Act").

It is well settled that there is a private action for damages for violation of Rule 10b–5. Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 (2d Cir. 1951); see Colonial Realty Corp. v. Bache & Co., 358 F.2d 178, 181 (2d Cir. 1966). There is a contention in the pretrial order that plaintiffs also claim common law fraud but, assuming this to be so, it does not alter the dimensions of the problem.

### I

National was incorporated in 1945 but apparently began business somewhat later.

Defendants Charles, William, Sidney and Henry Licht are brothers.

At all relevant times, Charles was president and director of National, William was vice-president and a director, defendant Bernstein was secretary-treasurer and a director, defendant Coviello (Director of Sales) and defendant Friedman (General Manager) were employees and familiar with the affairs of National, Sidney was a dentist and familiar with the affairs of National, and defendants Bluestone and Grapel were dentists, close friends of the Licht family and familiar with the affairs of National. Except that he was an original Class B stockholder, nothing appears as to any connection of Henry with National.

There were originally issued 600 shares of National, 250 of which were Class A, 250 of which were Class B, and 100 of which were Class C. The Class A and Class B stock each could elect two directors while the Class C stock could elect one director. The shares on original issue were sold for $100 each (Ex. C).

There was an agreement (Ex. C) among all stockholders, binding on heirs etc., which required that before any stock could be sold it had to be offered at "book value" to the "remaining stockholders of all classes" and to the corporation.

On October 23, 1951, Alexander Gould, an original holder of 62½ Class A shares transferred his 62½ shares to Jack Urdang. The sale price is not known.

On November 5, 1952, Bertha Schultz, an original holder of 24 Class B shares, transferred her 24 shares to defendant Charles. The sale price is not known.

Solomon Raduns, an original holder of Class A shares, sold his 62½ shares on

November 20, 1956 to the following in the amounts indicated:

| | |
|---|---|
| Esther Bernstein (wife of defendant Bernstein) | 10 |
| Sabina Licht (wife of defendant Charles) | 10 |
| Defendant Coviello | 42½ |

The sale price is not shown but whatever the amount, presumably it was "book value".

On December 13, 1956, Urdang sold his 62½ shares of Class A stock, on an offer to National and to other then stockholders. National itself bought 27½ shares as treasury stock and the other 35 shares were bought as follows:

| | |
|---|---|
| Sabina Licht | 5 |
| Defendant William | 10 |
| Defendant Coviello | 20 |

The purchase price paid was $159.09 per share which was presumably "book value".

Emanuel Frank, an original holder of 62½ Class A shares and a director, died on April 15, 1958. His 62½ shares were inherited by his daughter, plaintiff Bernice, married to Robert Ross, and by his son, plaintiff Lawrence. There was delay in issuing new certificates to plaintiffs because the original certificate had apparently been lost.

Arthur Licht, one of the brothers and an original holder of 24 Class B shares, died and on September 15, 1959 his shares were transferred to defendant Charles and a new certificate issued in the name of Charles. The financial basis for the transfer is not known.

On September 15, 1959, a certificate for 31¼ Class A shares was issued in the name of each plaintiff. By September 15, 1959, the other 187½ Class A shares were held as follows:

| | |
|---|---|
| Defendant Friedman | 62½ |
| Defendant Coviello | 62½ |
| Defendant William | 10 |
| Esther Bernstein | 10 |
| Sabina Licht | 15 |
| In National treasury | 27½ |
| | ——— |
| | 187½ |

By September 15, 1959, the 250 Class B shares were held as follows:

| | |
|---|---|
| Defendant Charles | 152 |
| Defendant William | 50 |
| Defendant Sidney | 24 |
| Defendant Henry | 24 |
| | ——— |
| | 250 |

By September 15, 1959, the 100 Class C shares were all held by defendant Bernstein.

There were no transfers of stock between September 15, 1959 and May 4, 1961.

After the death of Frank on April 15, 1958, there were no directors elected by the Class A stock. Until at least May 4, 1961, there were three directors: Charles and William (representing Class B stock) and Bernstein (representing Class C stock).

Between September 15, 1959 and May 4, 1961, there were—in addition to plaintiffs—only nine stockholders of National, of whom 5 were members of the Licht family, 2 were members of the Bernstein family, and the other two were Coviello and Friedman.

It seems clear that at all relevant times the Licht family controlled National, but there was harmony between them and the other insiders.

At all relevant times, Ross—husband of plaintiff Bernice—acted on behalf of both plaintiffs.

In June 1960, Ross offered the shares of plaintiffs for sale to the other Class A stockholders—defendant William, defendant Friedman, defendant Coviello, Sabina Licht and Esther Bernstein. The price asked was $12,797.50 in the aggregate, or $204.76 per share, said to have been "book value" (Ex. 8). Technically, this was not a compliance with the stockholders' agreement, under which the offer should have been to the holders of Class B and C stock also. In August 1960, plaintiffs offered their stock to the corporation for the same price (Ex. 9).

There were no replies to the offers to sell.

## II

The more significant events then took place in 1961 and in recounting them here the month and the day will be given (in some instances only the month); it will be understood that the year referred to is 1961.

On Tuesday, January 3, Ross had lunch near the offices with Charles. Ross said that plaintiffs wanted to sell their stock. Charles asked what price they wanted. Ross said $10,000 (or $160 per share). Charles said he "thought he could get a buyer for $5000" (SM 47; SM refers to pages of the stenographic minutes), or $80 per share. They then "settled on the figure of $7,500" (SM 25) which is $120 per share for the 62½ shares, meaning "It was left that he [Charles] would try and get somebody to buy the stock at $7500 and that I [Ross] would hear from him or his lawyer" (SM 25). Ross did not hear from Charles after January 3 nor did Ross and Charles ever have any other talk.

The findings as to the conversation between Ross and Charles on January 3 are based on the testimony of Ross, which is accepted as truthful and accurate, as well as on a stipulation of fact in the pretrial order (p. 2). The testimony of defendants is in many respects incredible and inconsistent and to the extent that it differs from that of Ross as to the January 3 conversation it cannot be accepted, nor may it be accepted as to much which followed.

It is entirely clear that there was no agreement in fact on January 3 or at any other time prior to May 4 for the purchase of the stock of plaintiffs. This is because there was no agreement in fact by Charles or by anyone else to buy the stock; Charles testified that he was not interested in buying the stock and "didn't know anybody" who was (SM 395). All Charles undertook to do on January 3 was, as Ross testified, to "try and get somebody to buy the stock at $7500" (SM 25). It is thus unnecessary to decide the hypothetical question, much discussed in the memoranda, whether an agreement in fact would have been void in law because of the statute of frauds.

The minute book of National contains minutes of a meeting purporting to have been held on January 3 (Ex. 15), in which minutes the following statements appear:

"Mr. Samuel Bernstein moved the adoption of the following resolution:

"RESOLVED, that Bernice Frank Ross and Lawrence H. Frank, owning jointly 62½ shares of Class A common stock, having offered to sell the same in one single block or unit to the other corporate stockholders and each of the stockholders having rejected the purchase of said stock in a single block or unit, be it RESOLVED, that Morris H. Linderman, attorney, 225 West 34th Street, New York, N.Y., arrange for the purchase in blank of said 62½ shares of stock in a single block or unit, for a group of personal friends of Dr. Sidney E. Licht, who have been acquainted with the Corporation.

"* * * This resolution was discussed, seconded and unanimously adopted."

The foregoing minutes were prepared long after January 3 and were backdated as part of the scheme later described.

At some time during January or February, Charles began to consider the possibility of selling shares of National stock through a public offering by underwriters and of having a group of insiders buy the shares of plaintiffs. While there is no direct evidence of this, it is a required inference from what actually took place.

In February, a banker introduced Charles to Irwin L. Germaise, Esq., an attorney. According to Charles and Germaise, they did not then have any business discussion. Charles must himself have had a public offering in mind at that time, however, and must have been discussing this with the banker because, according to Charles, the banker called Germaise over (in order to make the introduction) and after Germaise left, the banker told Charles that Germaise

was a good lawyer, good at "public lettings and SEC work" and had been "formerly associated with the SEC" (SM 408). Moreover, in a letter to the SEC it was stated that in February Charles was referred to the Germaise firm "in connection with a proposed offering of securities pursuant to Regulation A under the Securities Act of 1933" (Ex. 16).

Next, Bernice Ross received a letter dated February 28 from Morris H. Linderman, Esq., a lawyer for National, by which alone he was paid. The letter (Ex. 10) said that the "proposed alternate purchasers" of the stock were away and that when they returned Linderman would "contact" Bernice. He referred to the purchasers as his "clients". He was unable as a witness to explain the expression "proposed alternate purchasers" (SM 130). Linderman was, of course, acting under the instructions of Charles who was proceeding cautiously as to whether and when to arrange for purchase of the shares of plaintiffs. The reason for the caution of Charles was that his ideas for a public offering had not yet matured.

In the middle of April, Charles was decided to attempt a public offering. He retained Germaise as counsel for this purpose and beginning in the middle of April the officers of National (Charles, William, and Bernstein) with Germaise, were active in preparing for the public offering.

Germaise in April introduced Charles and William to representatives of two underwriting firms, Edward Lewis Co., Inc. (Lewis) and Underhill Securities Corporation (Underhill). There were discussions in April with these underwriters, including discussion of (a) the necessity for a recapitalization of National so as to make available a number of new shares for sale to the public at $300,-000 (the maximum permitted under Regulation A, cited hereinafter) and (b) the desirability of an increase of working capital by "a private offering of shares" which was to be at least "100 shares at $300 per share" (SM 505). The "100 shares" obviously referred to the old

stock. The discussions with the underwriters dealt also, of course, with the price of the new shares to be offered to the public; this price was to be $3 per share or the equivalent of $600 per share of old stock.

At all times since January 3, Charles knew that plaintiffs were anxious to sell their 62½ shares of old common stock for $120 per share and in substance Charles had an option to buy them at that price. Prior to the plan for a public offering, neither Charles nor any of the other defendants were interested in buying these shares; most of the defendants had refused to buy from plaintiffs. But with the prospect of a sale to the public at the equivalent of $600 per share, with the prospect of sales by a private offering at $300 per share, and with the improved outlook for National's business because of the additional working capital thus to be obtained, the picture changed completely. The purchase from the plaintiffs at $120 per share became most attractive.

When Charles realized in April that a private and a public offering would be attempted (and with at least some hope of the success which in fact it later had), Charles engaged with the other defendants in a scheme to divide the shares of plaintiffs among the insiders. It was realized that plaintiffs would not sell at $120 per share if they knew about the proposed private and public offering and that it would be risky for directors and officers to buy their shares openly from plaintiffs without disclosure. The scheme therefore was to use Sidney, Grapel and Bluestone as purported purchasers on a firm basis on January 3, to present these three as asking later to have their commitment reduced, to use Linderman as an isolating intermediary with plaintiffs and a conduit of the purchase price to them, and—once their shares were obtained—to divide them amongst the insiders on the basis that some of the insiders were acquiring from Sidney, Grapel and Bluestone as an accommodation to the latter.

Linderman in late April asked for the $7500 to be used to pay plaintiffs for their shares. He testified (SM 120–21) that he received checks from the following in the amounts indicated, payable to himself and not to plaintiffs:

| | |
|---|---|
| Grapel | $3,000 |
| Bluestone | 3,000 |
| Sidney Licht | 1,000 |
| Coviello | 600 |

He must have received these checks on or shortly after April 21; the check of Grapel appears to have been dated April 21 (SM 304, 307) but there is a reference to its date as April 31 (SM 302). Sidney denied sending anything to Linderman (SM 260–61) but, even if believed, this would not be any evidence of good faith but would make the explanations of defendants even more mysterious.

According to Linderman (SM 142), he thought at all times until May 4 that the purchasers were Sidney, Grapel and Bluestone. Why he should have received a check from Coviello if this were true, was not explained.

Linderman wrote under date of April 26 notifying plaintiffs that he was "prepared to close the purchase of the stock" (Ex. 11).

A special joint meeting of stockholders and directors of National was held on April 28. At this meeting and in obvious preparation for the public offering already under discussion, it was resolved to amend the certificate of incorporation to change the Class A, Class B and Class C common stock, par value $100, into one class of no par value common stock and to eliminate the classification of directors so that all directors would be elected by all stockholders. It is also recited that 5 shares of common stock were to be presented to a Dr. Florio, such stock to come from the 27½ shares of Class A common stock in the corporate treasury.

The April 28 joint meeting of stockholders and directors is recited to have been held on waiver of notice signed by "all the stockholders". All of the defendants signed such a waiver, including Grapel and Bluestone, who in fact did not become stockholders until after May 4.

On May 1, Charles for National signed an underwriting agreement with Lewis and Underhill. This agreement, among other things, required the underwriters to use their best efforts to sell for account of National 100,000 shares of common stock, par value 10¢ per share, at $3 per share (equivalent of $600 per share of the original $100 par value stock). National agreed to qualify the shares for sale under Regulation A (17 C.F.R. §§ 230.251 and following) issued by the SEC under Section 3(b) of the 1933 Act (15 U.S.C. § 77c(b)).

On May 4, Ross went to Linderman's office and turned over to him the two stock certificates of plaintiffs, each endorsed in blank. Linderman delivered two of his own personal checks, one to each plaintiff in the amount of $3,750.

Linderman testified (SM 121–22) that he received from defendants $7600, then paid plaintiffs $7500 and then "drew a third check for $100 and returned it to somebody". Who this "somebody" was, never appeared.

Ross testified that if it had been known by plaintiffs that there was going to be a public issue of stock by National, they would not have sold their shares (SM 34).

Prior to May 4, each of the defendants knew of the proposed public offering at a price which was equivalent to $600 per share of old common stock. Charles, William and Bernstein admitted this (SM 149, 354, 408). The other defendants denied knowledge until after May 4 (SM 186, 187, 221, 261, 288, 312, 381) but such denials are not accepted.

Prior to May 4, the defendants also knew of the proposed private offering at $300 per share; they knew that defendant Grapel was himself going to get three of the shares in that offering (SM 315–16).

In connection with the purchase of shares from plaintiffs, no defendant ever made any statement to plaintiffs

about the affairs of the company or about the value of the shares.

Ross made no inquiries of Charles or of any other defendant or of Linderman as to the affairs of National or the identity of the purchasers of the shares of plaintiffs.

No defendant ever told plaintiffs, or either of them, or any representative of them, of the proposed public offering nor of the proposed private offering nor of the identity of the purchasers of the stock of plaintiffs. Neither plaintiff knew about the public offering nor of the private offering nor of the identity of the purchasers from them until long after the sale had been made.

After May 4, according to Linderman, Sidney told him that the doctors "had agreed to sell their interests * * * to others" and gave Linderman a list of the others (SM 138).

New Class A common stock certificates were then issued, dated May 5, representing the shares sold by plaintiffs, to the following persons for the number of shares indicated:

| | |
|---|---|
| Charles | 15 |
| Bluestone | 10 |
| Friedman | 10 |
| Grapel | 7 |
| William | 5½ |
| Bernstein | 5 |
| Coviello | 5 |
| Sidney | 2½ |
| Henry | 2½ |
| | 62½ |

According to William, he and Sidney paid for the 2½ shares transferred to Henry and gave these shares to Henry "as a gift" (SM 352). Except to receive these 2½ shares, thus presumably as a gift, Henry appears to have had nothing to do with the transaction.

The sale by plaintiffs was therefore to the persons listed just above (except Henry), for whom as undisclosed principals Linderman was acting.

### III

The explanations by defendants cannot be accepted. The findings already made are required as the only reasonable inferences from established facts and from the testimony of defendants, in many respects incredible and inconsistent. To analyze such testimony in detail would unduly prolong an otherwise overlong opinion. A few matters may be mentioned.

### A.

From the testimony of defendants themselves, it is impossible, as a matter of timing, for any sale to Sidney, Grapel and Bluestone to have taken place, or any commitment by them to have been made, on January 3.

The meeting between Ross and Charles took place on January 3, which was a Tuesday. New Year's Day fell that year on Sunday and the following Monday was therefore a legal holiday (General Construction Law, McKinney's Consol.Laws, c. 22, § 24). It was after lunch on January 3 when Charles agreed to try to find a purchaser and it was the first day on which he could have telephoned Sidney. From the testimony of defendants Sidney, Grapel and Bluestone as to their telephone calls, meetings, price discussions, etc., no commitment by them could have been made for at least a week after January 3 (SM 190, 195, 198, 225–32, 305–06, 340).

Since it was thus impossible for the three dentists to have committed themselves on January 3, it follows that it was impossible for any meeting of National to have been held "at 3:00 P.M." on January 3 at which a resolution could have been adopted directing Linderman to "arrange for the purchase *in blank*" of the stock of plaintiffs "for a group of personal friends of Dr. Sidney E. Licht" (Ex. 15; emphasis supplied). Yet the minutes reflect such a meeting and such a resolution (Ex. 15). Why were the minutes so created? The only reasonable inference is that it was part of the masking scheme.

### B.

If there had been any sale to Sidney, Grapel and Bluestone on January 3, it is inconceivable that transfer of the shares

would have been delayed to May 4. The testimony of defendants contains no credible explanation of the delay. According to Grapel and Bluestone, they were asking Sidney how the transaction was progressing (SM 199–200, 340), and Sidney told them he was "working on it" (SM 340, 199). In this connection it is significant that Linderman did not *ask for*, nor receive, any moneys with which to pay plaintiffs until *April*. So Sidney testified unequivocally at his deposition (SM 250) and at trial on direct examination (SM 219, 220) and while Sidney later attempted (SM 241, 242, 251) to suggest that Linderman had asked for funds at an earlier time than April, the suggestion cannot be accepted.

The explanation for the delay in acquiring plaintiffs' stock from January 3 to May 4 is that it was only *after* the public and private offerings were in contemplation in April that any defendant had any interest in acquiring the shares from plaintiffs.

### C.

The manner in which the purchase price was raised and paid is strong evidence of the scheme in operation. It cannot be consistent with good faith.

Linderman was obviously being used as a shield, but why was he sent $7600—according to his testimony—instead of $7500?

Sidney sent nothing to Linderman, according to him (SM 260–61). If this be true, Linderman received only $6600. From where did the rest come?

If Linderman believed up to at least May 4 that Sidney, Grapel and Bluestone were the purchasers, as Linderman flatly testified (SM 142), why should he have received a check for $600 from Coviello?

While Coviello furnished Linderman with $600, the proper amount for his shares (5 shares at $120 per share), Friedman paid $1200 for his shares (10 shares at $120 per share) not to Linderman but to National itself (SM 376). The efforts of Charles to explain this transaction (SM 476–485) were not successful and the relevant corporate records were never produced.

There is no relationship between the amounts given Linderman by Grapel and Bluestone and the number of shares bought by them from plaintiffs. They suggest (SM 186, 306) that they were also carrying Sidney's share but, if so (and assuming Sidney paid nothing), Sidney, Grapel, and Bluestone should have received 50 shares ($6000 divided by $120 per share is 50 shares). In fact, the three received an aggregate of only 20¾ shares (including the 1¼ share gift from Sidney to Henry). I have considered their various explanations but do not find them convincing.

### D.

If Sidney, Grapel, and Bluestone were at one time the purchasers of the stock, neither the necessity for, nor the method of, the allocation of shares is satisfactorily explained.

Sidney testified that when he got a telephone call from Linderman "to send the moneys" (SM 217), which he fixed as in April (SM 219, 220), he "in turn" called Grapel and Bluestone who asked him "to attempt to lower our original commitment" (SM 220); this was because they were "a little tight" (SM 217). Sidney also was then "tight financially" (SM 217).

The testimony of Bluestone and Grapel is inconsistent with this.

Bluestone testified that he was in "three ways" with the other two (SM 183), that he made out his check for $3000 on instructions from Sidney (SM 183–4), that he "advanced more than a third" in order to cover Sidney (SM 186), that he never told Sidney he "desired to receive less than [his] pro rata share" (SM 203), and that he was never told that "Dr. Grapel was short of cash" (SM 207).

There is some weak testimony by Grapel which would suggest that at one time he may have talked to Sidney about reducing his commitment (SM 315, 335–36). Grapel testified positively, however, that after he returned from Mexico

(which he fixed as the "last week in March or the first week in April" (SM 307) and thus before Linderman had asked for money), he asked Sidney "to have the original amount of stock restored" to him (SM 336) and told Sidney to put him "back on the original amount" (SM 338). Grapel testified that he told Sidney that he (Grapel) "could go in for the original amount financially" (SM 339). Grapel further testified (SM 307) that he was told by Sidney to send a check for $3000 to Linderman and did so, that he was in for "thirds" with the other two but he and Bluestone were covering Sidney's third (SM 314-15, 331), that the shares were going to be divided between the three (SM 331), and that he knew Bluestone "wanted as much stock as possible" (SM 337).

Thus, even on the testimony of defendants, there is no evidence to justify any allocation of shares to anyone except Sidney, Grapel and Bluestone.

It should be added that the testimony of Grapel and Bluestone as to the method of allocating the shares of plaintiffs is impossible to square with the theory for defendants on the facts. Grapel said he was simply told by Sidney that he was only to get 7 shares (SM 337), that he was disappointed (SM 338), that he knew nothing about the allocation to the others (SM 338), but that he understood the allocation was made by Sidney (SM 343-44). Bluestone testified that he was in New York at all times from January through May and was never told of any reason for delay (SM 201), that he learned for the first time in May 1961 that he would receive 10 shares (SM 203), and that he assumed the other shares bought had gone to Sidney and Grapel (SM 206-07).

If Sidney, Grapel and Bluestone had together bought the shares in January and if Grapel and Bluestone were advancing Sidney's share, how does it happen that in May Grapel and Bluestone believe that Sidney is doing the allocating of the shares? (It is more likely that it was Charles who was in fact doing the allocating.) The question is especially pertinent because Sidney denied that he was to make the allocation (SM 237-38); he said that "the three of us would" (SM 238).

### E.

The evidence requires the finding already made that the defendants knew, before their purchase of shares at $120 from plaintiffs on May 4, of the proposed private offering at $300 and of the proposed public offering at $600.

The evidence as to the Licht family relationship, the position of Coviello and Friedman as substantial stockholders and responsible employees, and the close connection of Grapel and Bluestone with National and with the Licht family, would without more compel the finding. But there is more.

None of the defendants had shown any interest in buying shares from plaintiffs (e. g. SM 43, 44, 189, 190, 210, 324); Coviello, William and Friedman were offered the shares in June 1960 at book value ($204.76 per share) and, while if interested they might have wished to lower the price, they never even replied to the offer.

Moreover, Sidney, Grapel and Bluestone testified that they knew nothing of the financial structure or condition of National, or of its profits or losses, or of its balance sheet, or as to dividends (SM 192, 193, 226-28, 329-30). The best reason they could give for a sudden interest in National shares was the "potential" of the company (SM 229; also 228).

The only reasonable explanation is that at the time each defendant decided to buy shares from plaintiffs he knew of the proposed public and the proposed private offering.

Moreover, each defendant signed a waiver of the April 28 joint meeting of directors and stockholders which was in preparation for a public offering. It would be only natural in considering the signing of such a document for defend-

ants to ask and to receive an explanation of its purpose.

## IV

On May 11—one week after the purchase by defendants of the shares of plaintiffs—the stockholders of National executed a certificate of amendment of the certificate of incorporation giving effect to the amendments approved at the April 28 meeting (notice of which, if in fact held that day, should have been, but was not, given to plaintiffs). It was provided, in addition, that the authorized shares of common stock, no par value, be increased to 700 and that the directors could authorize the issuance of the 100 unissued shares. It was undoubtedly the addition of this last feature (not taken up at the April 28 meeting) which led to use of the more awkward certificate of amendment signed by all stockholders (Stock Corporation Law, McKinney's Consol.Laws, c. 59, § 37(1) (B)) rather than the use of a certificate signed only by officers on the basis of the April 28 meeting (Stock Corporation Law, § 37(a) (C)).

The certificate of amendment became effective upon its filing with the Secretary of State on May 17. (General Corporation Law, McKinney's Consol.Laws, c. 23, § 8(2)).

On May 18, National sold privately 122½ shares of its $100 par value common stock for $300 per share (Ex. 14). There are no minutes of any meeting of directors which authorized such sale; at this time, the directors and officers were the same persons (Charles, William and Bernstein). The 122½ shares sold were the 100 shares resulting from the increase in authorized shares by the amendment to the certificate of incorporation, effective May 17, plus the 22½ shares remaining of the 27½ shares in the corporate treasury after issuance of 5 such shares to Dr. Florio. The 122½ shares were sold for $300 per share. The sale of these shares was made in order to raise working capital and thus improve the financial statements for the public offering (SM 416). The purchasers were "friends and relatives who knew the members of the firm pretty well" (SM 418), who were relatives or "connected with and had been particularly useful to the company in the past" (SM 468), and who "knew the company" (SM 418). They were told of the proposed public offering (SM 173, 463). The price of $300 per share was considered by Charles and the other officers of National to be "fair and reasonable" (SM 417). In the case of one purchaser, there was testimony that the purchase was made after an inquiry whether "there was any stock available before it went public" (SM 174), and that the purchase was not a philanthropy but was to make money (SM 174).

Defendant Grapel was permitted to have 3 of these shares sold at $300, apparently to assuage his disappointment (SM 337–8) at receiving only 7 of the shares bought from plaintiffs at $120. Whether Grapel paid $300 per share for these shares and, if so, how he paid is not known; the confusion in his financing of the purchase from plaintiffs is confounded.

On May 22, according to the minute books, there were special meetings of directors and of stockholders which, among other things, authorized the officers (a) to file a certificate of amendment to the certificate of incorporation changing the number of authorized shares from the 700 then issued shares of common stock, no par value, to 1,-000,000 shares of common stock, par value 10¢ per share, and (b) upon such amendment becoming effective to issue 200 shares of the new common stock, 10¢ par value, for each share of old common stock, no par value.

The amendment to the certificate of incorporation authorized at the May 22 meeting of stockholders became effective on June 7. Thereafter, the new 10¢ par value common stock was issued in exchange for the old common stock in the ratio of 200 shares of new for each share of old.

At a meeting of directors on June 7, stock options and increased compensa-

tion were approved for Charles, Bernstein, Coviello and Friedman.

At a meeting of stockholders on June 15, Friedman, Coviello and Germaise were elected as directors. The board then had six members, the others being Charles, William and Bernstein.

Under date of June 22, National filed with the SEC its notification, with offering circular and other papers, to permit the sale to the public of the $300,000 issue under the Regulation A exemption.

The notification to the SEC, signed by Charles, contains a statement as Item 9 (b) that plaintiffs sold 62½ shares to the persons to whom stock certificates were issued on May 5 (Ex. 17). This statement is, of course, inconsistent with the testimony of defendants that plaintiffs sold to Sidney, Grapel and Bluestone who, to lighten their commitment, thereafter resold to Charles and the other insiders.

While the offering circular in the case of a Regulation A issue never becomes "effective" as in the case of a "registration statement" (15 U.S.C. § 77h), the SEC does comment by letter on the papers filed under Regulation A, pointing out deficiencies; it is not safe to proceed with a Regulation A offering until the SEC advises that it has no further comment. See 1 Loss, Securities Regulation (2d ed.; hereafter cited as "Loss") 625–626.

The SEC apparently took the position that the Regulation A exemption, limited to $300,000 in one year, (17 C.F.R. § 230.254), was not available to National because the sale price of the 122½ old shares sold on May 18, when added to the proposed public offering, would aggregate more than $300,000. The SEC so notified counsel to National on September 8 (Ex. G).

It was then agreed with the SEC on October 5 by counsel for National that *all* of the outstanding stock of National would be placed in escrow for one year from the date of the public offering (Ex. 18). On this basis, the SEC withdrew on November 8 its objection to the avail-ability of the Regulation A exemption (Ex. H).

On November 29, Charles sold to Friedman 5,000 shares at 10¢ per share and William sold to Friedman 2,000 shares at 10¢ per share (Ex. 14, p. 13). The shares were transferred on the corporate books to Friedman on December 4 (Ex. 19). There is no evidence as to the reasons for these sales to Friedman.

Although the agreement with the SEC was that all outstanding shares would be placed in escrow (Ex. 18), in fact only those shares were placed in escrow which had been acquired within one year before November 30, the date of the escrow agreement (Ex. 17; SM 571–72). For example, Esther Bernstein and Sabina Licht placed no shares in escrow, apparently on the theory that they had acquired no shares within the one year period.

The explanation for the failure to place all outstanding shares in escrow, as agreed with the SEC, is not apparent. Germaise testified (SM 532–33) that at the time he "believed that all shares had in fact been placed in escrow but they were not". This testimony as to his belief is hard to credit because Germaise was acting as counsel on all SEC matters and himself actually signed the escrow agreement filed with the SEC on December 6, and which on its face showed that only 59,500 shares were placed in escrow, out of 161,500 shares then outstanding. As Germaise admitted (SM 571–72), the only stock placed in escrow "was the stock which had in fact been transferred within the year previous". Whether the SEC agreed to the change or whether defendants simply ignored the agreement in the hope that the change would not be noticed, is not known and, in any event, does not affect this decision.

The SEC had various further comments (not related to the escrow agreement) which were satisfied by amendments to the filed papers (Ex. 17) and the public offering was made by the underwriters on December 22 (SM 537–38). The public offering was successful

and by December 29 all the 100,000 shares had been sold to the public at $3 per share (pretrial order p. 4). Within two or three weeks after December 22, the net sale proceeds were received by National (SM 426).

Plaintiffs learned of the public issue for the first time after a newspaper advertisement of the issue appeared on January 2, 1962.

During the period January 2, 1962—January 2, 1963, there were bid and asked quotations in the "pink sheets" for over-the-counter shares (see 2 Loss 1278–79). The high bid was 4¼ on January 2, 1962; the low bid was ¼ on November 20, 1962 and on several days thereafter (Ex. I); the bid and asked prices were in a declining trend during the period.

Except for Friedman, none of the defendants at any time sold any National shares owned by them, whether acquired from plaintiffs or otherwise.

Friedman sold his National shares in 1965 for an average of 50¢ per share (SM 377). He had 21,500 shares which cost him a total of $8,150, for which he received $10,750, or an overall profit of $2,600. On the 2,000 shares acquired from plaintiffs for $1,200, he lost $200.

For a variety of business reasons, evidently not anticipated in 1961, National did not prosper and on September 7, 1966 filed a petition under Chapter XI of the Bankruptcy Act (11 U.S.C. §§ 701–799); this means that National had become "insolvent" or unable to pay its debts as they matured (11 U.S.C. § 723).

It is assumed, for present purposes, that by 1965 the new National shares had become worth not more than 50¢ a share, the equivalent of $100 per old share sold by plaintiffs for $120, and that at some later time they became valueless, or almost so.

## V

We now face the two questions: (1) are defendants, or some of them, liable to plaintiffs? and (2) if so, what are the damages for which they are liable?

## A.

Preliminarily there seems to be no basis in the evidence for any judgment against defendants National and Henry.

None of the defendants purported to act for National with respect to the shares of plaintiffs. National did not buy any shares from plaintiffs and, while defendant Friedman paid $1200 to National for his shares (SM 376), this was undoubtedly part of the tangled web and of no benefit (on balance) to National.

Henry was not an officer, director or employee of National and while he may have been an insider, he did not himself purchase any shares from plaintiffs or do anything (so far as the evidence shows) to further the scheme. Henry did receive 2½ shares of the shares sold by plaintiffs but there is nothing to dispute the testimony that he was given these 2½ shares by Sidney and William (SM 352). There is no evidence that Henry engaged in "any act, practice or course of business * * * in connection with the purchase of any security". 17 C.F.R. § 240.10b–5.

## B.

The other defendants are the purchasers from plaintiffs but no defendant made any representations to plaintiffs. Was there, however, an affirmative duty to disclose to plaintiffs the proposed public and private offerings and the identity of the purchasers from plaintiffs?

Rule 10b–5 requires that a corporate insider purchasing stock from an outsider must disclose any material fact known to him by reason of his inside position but not known to the outsider. If there is a failure to make such a disclosure, and if the outsider would have been influenced not to make the sale had there been disclosure, then the insider is liable to his seller. A material fact is one to which a reasonable man would attach importance in determining his choice whether to make the sale or not. List v. Fashion Park, Inc., 340 F.2d 457, 461–463 (2d Cir. 1965), cert.

denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1966).

### C.

■ The identity of the purchasers from plaintiffs does not seem to me a material fact. Plaintiffs were actually soliciting a sale to the insiders and other stockholders long before May 4. Indeed, they were required first to offer their stock to the other stockholders, who in this corporation inevitably included officers, directors and other insiders. I do not believe plaintiffs cared who bought their shares, whether Charles himself or someone else.

■ On the other hand, that National on and before May 4 was proposing to sell some hundred or so shares privately for $300 per share and 500 shares (equivalent to 100,000 new shares) at $600 per share (equivalent to $3 per new share) do seem to me clearly to be material facts. In addition to their importance in determining whether to sell at $120 per share, these facts were of importance in determining whether to sell at all. The proposed private and public offerings, if accomplished (as they were), would bring in some $260,-000 to National. In terms of future possibilities, this is to be compared with the original capital of National of $60,-000 and its retained earnings up to December 31, 1960 of $67,625.02 (Ex. 14). At May 4, National had a capital and surplus of slightly more than $127,-625.02.

Corporate insiders, purchasing from plaintiffs, were under a duty to disclose the proposed private and public offerings.

### D.

Who were the corporate insiders?

■ Certainly directors and officers are insiders. This means that Charles, William, and Bernstein were insiders.

■ Coviello and Friedman were substantial stockholders and responsible employees of National and as such learned of the proposed private and public offerings. Judge Bonsal has recently

treated as corporate insiders employees who were not directors and officers. Securities and Exchange Commission v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 278–279 (S.D.N.Y.1966). See In re Cady, Roberts & Co., 40 SEC 907, 912–13 (1961). In determining whether a person, not a director or officer, is a corporate insider it seems to me that the test is whether he had such a relationship to the corporation that he had access to information which should be used "only for a corporate purpose and not for the personal benefit of anyone". In re Cady, Roberts & Co., above at 912. Certainly information as to the proposed private and public offerings of National should have been used only for the purposes of National. Coviello and Friedman obtained this information because of their relationship to National, stockholders and employees. They were insiders.

■ What about Sidney, Grapel and Bluestone? Applying the test above stated, they were insiders also. National was controlled by the Licht family, of which Sidney was a member and in close touch with Charles and William. Grapel and Bluestone had been close friends for some thirty years of Sidney and of Charles. Despite their denials, they must have known a great deal about National. The three—Sidney, Grapel and Bluestone—made a one year loan of $10,000 to National in 1959. Sidney was not sure whether each loaned $10,-000 or the three together loaned $10,000 (SM 211–12). Bluestone (SM 180–81) and Grapel (SM 303) seemed to remember that the loan was $10,000 in the aggregate. Counsel to National thus described Dr. Grapel to the SEC (Ex. 18):

"Dr. Edward Grapel, a practicing dentist, has been known intimately by the majority of the issuer's officers and directors for more than twenty-five (25) years. Dr. Grapel is an advisor to the issuer without compensation and has referred business to the issuer, also without compensation. Dr. Grapel has previously been engaged in oil and mineral investments

with Dr. Sidney Licht and Dr. William V. Licht and has been a partner in a real estate business with Dr. William Licht and Dr. Sidney Licht, and some of the officers, directors and principal stockholders of the Company.

"Dr. Grapel is a close social friend as well as a business associate of the President and Vice President of the issuer. He has visited the premises of the issuer on many occasions and is fully familiar with the business activities of the Company."

And thus described Bluestone:

"Dr. Leonard Bluestone is an oral-surgeon who has been known to the Lichts for approximately fifteen (15) to twenty (20) years. He is engaged in an oil and mineral investment with Dr. William Licht and Dr. Sidney Licht. He has also loaned the Company $10,000 which sum has now been repaid. On numerous occasions he has visited the facilities of the Company and is fully informed of the business activity of the issuer through his personal observation and social communication with the principal officers and directors of the Company. On many occasions previous to the sale of the securities to him, he expressed an interest in purchasing shares in the Company as soon as such shares became available. The death of Emanuel Frank made such shares available to him."

If Sidney, Grapel and Bluestone were not insiders, they would seem to have been "tippees" (persons given information by insiders in breach of trust) and subject to the same duty as insiders. In re Cady, Roberts & Co., above; 3 Loss 1450–51. And in any event, Sidney, Grapel, and Bluestone would be equally liable with the other defendants for aiding and abetting a violation of Rule 10b–5. Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673, 676–681 (N.D.Ind.1966); Pettit v American Stock Exchange, 217 F.Supp. 21, 28 (S.D.N.Y.1963).

E.

Reliance is an essential element of a cause of action under Rule 10b–5. "The proper test is whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact". List v. Fashion Park, Inc., 340 F.2d above at 463. I find that plaintiffs would not have sold their shares at $120 per share had they been told of the proposed private and public offerings at $300 per share and $600 per share, respectively.

F.

What is the measure of damages to be applied?

It is the difference between the "fair value" when plaintiffs sold their shares and the price at which they sold. Absent market value (as here), "fair value is to be determined from all the pertinent circumstances both for a reasonable time before the sale and after it. * * * If there can be no exact calculation * * * the wrongdoer cannot complain if a reasonable approximation is reached". Broffe v. Horton, 172 F.2d 489, 495 (2d Cir. 1949). The measure of damages in a Rule 10b–5 case has similarly been stated as "the difference between the price received by the plaintiff and the real or actual value of the stock at the date of the sale". Kohler v. Kohler Co., 208 F.Supp. 808, 825 (E.D.Wis.1962), affirmed, 319 F.2d 634 (7th Cir. 1963).

There is not a great deal of evidence as to the fair value on May 4, 1961 of National shares.

According to the minute books National paid the following per share dividends:

| 1952 | $20 |
|------|-----|
| 1953 | 15 |
| 1954 | 12 |
| 1955 | 15 |
| 1956 | 15 |

The minute books do not disclose any other dividend payments.

In late 1956, 62½ shares of Class A stock were sold at $159.09 per share, 27½ shares to National itself and the rest to other then stockholders.

The book value of the common stock of National on May 4 must have been at least $204.20 ($60,000 original capital plus $67,625.02 retained earnings to December 31, 1960 (Ex. 14, p. 19) divided by 600 shares).

The best evidence of the actual value of the shares is the sales by National itself on May 18, only two weeks after the sales by plaintiffs. The May 18 sales were at $300 per share which Charles testified (SM 417) was "the fair and reasonable price". The $300 price could not have been greatly in excess of the actual value because the persons to whom the 122½ shares were sold on May 18 were "friends" and "relatives" who "knew the company" (SM 418). Grapel was one of the purchasers at $300 per share.

I find that the fair value of the Class A common stock of National on May 4, 1961 was $300 per share.

Each plaintiff therefore suffered actual damages of $5,625, the difference between $9,375 (the fair value of 31¼ shares at $300 per share) and $3,750 (the amount actually received).

## G.

Are the defendants each liable for the full amount of the damages of plaintiffs or only in proportion to their several purchases from plaintiffs?

Each defendant failed to make disclosure to plaintiffs and each defendant participated in the scheme to purchase by the method followed. If any defendant—regardless of number of shares purchased—had made the disclosure, the scheme would have collapsed. Therefore, the participation of each defendant was essential to success of the scheme and there is no way to apportion guilt.

Under these conditions, the principle is that each joint tortfeasor is liable for the full amount of damages.

Restatement, Torts, §§ 875, 876 (1939); Prosser, Torts, 259 (3d ed. 1964); 1 Harper and James, Torts, 698–9 (1956).

## H.

In determining whether prejudgment interest is to be allowed to plaintiffs on their principal damages, federal law governs. With reference to the right created by Section 16(b) of the 1934 Act (15 U.S.C. § 78p(b)), our Court of Appeals has said that "being a federal right, its remedial aspects also are a matter of federal law." Gilson v. Chock Full O'Nuts Corp., 331 F.2d 107, 109 (2d Cir. 1964). A right of action under Rule 10b–5 is similarly a federal right.

"Traditionally, at common law prejudgment interest on an unliquidated tort claim is not allowed." Petition of the City of New York, 332 F.2d 1006, 1008 (2d Cir.), cert. denied, City of New York v. Bernstein, 379 U.S. 922, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964).

Under federal law, "interest on unliquidated claims is a matter within the discretion of the Court. The same rule applies to cases based on fraud." Speed v. Transamerica Corp., 135 F. Supp. 176, 198 (D.Del.1955), affirmed, 235 F.2d 369 (3d Cir. 1956).

The Supreme Court has said that "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable." Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939). This statement has been quoted with approval by the Supreme Court in affirming judgment for recovery without prejudgment interest under Section 16(b) of the 1934 Act (15 U.S.C. § 78p(b)). Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).

Discretion will be exercised to deny prejudgment interest in the case at bar. Among the factors considered is this: while defendants have been wrongdoers, they did not profit from

their wrongdoing as undoubtedly they had hoped to do but in fact appear to have lost substantially all the purchase price paid by them to plaintiffs.

## I.

The several contentions for defendants, if not specifically mentioned herein, have been considered and found without merit.

Mention may be made in passing of the contention that because National shares were not registered under the 1933 Act, their saleability by the plaintiffs was so impaired that plaintiffs suffered no damages. It is impossible to understand this contention. National sold 122½ unregistered shares in May 1961; National sold unregistered shares in June 1961 to Charles, William and Germaise; Charles and William sold unregistered shares in November 1961 to Friedman; and defendants bought unregistered shares from plaintiffs in May 1961. How then can it be argued that saleability by plaintiffs was impaired? Moreover, it is perfectly clear that any transaction by plaintiffs would be exempt under 15 U.S.C. § 77d (1), they being neither issuers, underwriters, nor dealers.

The foregoing contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

The Clerk is directed to enter judgment in favor of defendants National Hospital Supply Co., Inc. and Henry Licht.

The Clerk is directed to enter judgment for $5,625 in favor of plaintiff Bernice Frank Ross against defendants Charles S. Licht, Samuel Bernstein, Michael J. Coviello, Leonard Bluestone, Edward Grapel, William V. Licht, Seymour M. Friedman and Sidney E. Licht.

The Clerk is directed to enter judgment for $5,625 in favor of plaintiff Lawrence H. Frank against defendants Charles S. Licht, Samuel Bernstein, Michael J. Coviello, Leonard Bluestone, Edward Grapel, William V. Licht, Seymour M. Friedman and Sidney E. Licht.

So ordered.